UNITED ARTISTS CORPORATION, the Azimuth Company, Inc., Mirisch Films, Inc., Geoffrey Productions, Inc. and Depatie-Freleng Enterprises, Inc., Plaintiffs,

v.

FORD MOTOR COMPANY, Kenyon & Eckhardt, Inc., Frank Johnson, Jack Lane, Lyman D. Gridley, Robert Dusseau, Var Heyl, Edward A. Soukup, Ray Swenson, Vern Spohn, Jim Sherwood, Owen Jones, Individually and as presidents of the regional Lincoln-Mercury Dealers Associations, Phil Kimmelman Associates, Inc., Does One to Fifty, inclusive, Defendants.

No. 76 Civ. 4444 (LBS).

United States District Court,
S. D. New York.

Jan. 3, 1980.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, for plaintiffs; Gerald Meyer, Martha R. Overall, Martin Stein, and Elizabeth Greenspan, New York City, of counsel.

Coudert Bros., New York City, for defendants; Eugene L. Girden, Pamela G. Ostrager and R. David Jacobs, New York City, of counsel.

SAND, District Judge.

The principal issue to be resolved in this case, tried to the Court on the issue of liability only, is whether the use in defendants' television commercials of an animated humanoid feline character infringes on any proprietary rights of the plaintiffs who are the owners or assignees of copyrights in the motion pictures entitled "The Pink Panther" and "The Return of the Pink Panther".[1] We have concluded that it does not and set forth herein our findings of fact and conclusions of law pursuant to F.R. Civ.P. 53.

### I. *Genesis of the Two Animated Characters.*

We begin with the animated character known as the "Pink Panther" which was created by Blake Edwards for the motion picture entitled "The Pink Panther" ("TPP"). Plaintiff Depatie-Freleng Enterprises, Inc. designed, produced and animated the opening and closing credits of this motion picture, and it is only during those credits that the animated Pink Panther appears. A Certificate of Registration of Copyright for "TPP" was issued to "Mirisch-G&E Productions" on or about March 25, 1963, and on March 17, 1975, all of the right, title and interest in the motion picture was assigned to plaintiff United Artists Corporation. This assignment was recorded in the Copyright Office on or about March 25, 1975.

The animated Pink Panther's next motion picture appearance was in the opening and closing titles of the film entitled "The Return of the Pink Panther" ("RPP"), which was produced by plaintiff Independent Television Corporation pursuant to a license granted by United Artists on May 3, 1974. The copyright certificate for this second film was issued in the name of United Artists. The opening and closing titles for RPP were produced and animated by Richard Williams Limited in England. Mr. Williams testified that the only source materials used by him in doing this animation were materials relating to the Pink Panther character itself.

During the eleven year interval between the two motion pictures, the Pink Panther was the subject of further exploitation by Depatie-Freleng in the form of cartoons exhibited in theatres and shown on television. The character, originally conceived of as a device to heighten interest in TPP'S credits and to set a tone and mood for that film, had in a sense "stolen the show," and the animated Pink Panther became a character and personage in its own right. Plaintiffs' copyright claims relate only to the two films. The interim history of the character is significant only insofar as it relates to questions concerning changes in the character's appearance and personality which are discussed later in this opinion.

---

1. The plaintiffs in this action are United Artists Corporation, The Azimuth Company, Inc., Mirisch Films, Inc., Geoffrey Productions, Inc. and Depatie-Freleng Enterprises, Inc. The defendants are Ford Motor Company, Kenyon & Eckhardt, Inc., Frank Johnson, Jack Lane, Lyman D. Gridley, Robert Dusseau, Var Heyl, Edward A. Soukup, Ray Swenson, Vern Spohn, Jim Sherwood, Owen Jones, individually and as presidents of the regional Lincoln-Mercury Dealers Associations, Phil Kimmelman Associates, Inc., Does One to Fifty, inclusive. In view of our findings in this case, we do not reach the issue of the responsibility of Ford Motor Company for the actions of the Lincoln-Mercury Dealers Associations.

Plaintiffs contend that the animated Pink Panther character which appears in RPP was substantially the same and consistent with the animated character as it appeared in TPP. Defendants dispute this and say that there was such a radical change in the character itself that no single identifiable or legally protectable Pink Panther character exists. Indeed, the Pink Panther's personality is depicted differently in the two films. We speak of the "personality" of the character because the rights which plaintiffs seek to enforce are in an animated character. These rights extend, plaintiffs contend, and the Court agrees, not merely to the physical appearance of the animated figure, but also to the manner in which it moves, acts and portrays a combination of human and feline characteristics.

The Pink Panther's initial appearance in TPP was of a character which defendants appropriately describe as "a buffoon." He was extremely accident-prone and was, in the words of one of defendants' witnesses, a "schlemeil." He was a clumsy, inept and comical figure. In no sense could it be said that the Pink Panther in the initial film conveyed an image of power, poise, sophistication or self-confidence. In the second film, however, the situation was quite different. According to the testimony of Blake Edwards, the Pink Panther's creator, the character's depiction in RPP was influenced by "That's Entertainment", a recent and favorably received film which consisted of excerpts from motion pictures featuring prominent stars doing routines that had made them famous. The Pink Panther character in RPP was to be a "show-biz" oriented figure who imitated the tap dance routines of Fred Astaire, who wore a hat such as the one worn by Carmen Miranda in her film appearances, and who otherwise engaged in impersonations of famous motion picture performers. While the idea of using the animated character to heighten interest in the credits remained the same, the Pink Panther thus emerged in the second film as a far more sophisticated, urbane figure than he appeared in his first film.

We turn next to the very different origins of the Lincoln-Mercury animated cat, a feline humanoid character which appears in television commercials produced by defendant Kenyon & Eckhardt ("K&E") for ten Lincoln-Mercury Dealers Associations ("LMDA"). In November of 1975, K&E's Account Executive on the LMDA account, Leo Ahern, received a request from the Boston LMDA for advertising ideas for the new car line introduced in September of that year. Ahern relayed this request to William F. Suchmann, the Assistant Creative Director at K&E, and advised Suchmann that new ideas for 30 and 60 second television commercials would be needed to advertise the nine car lines offered by the Lincoln-Mercury dealers for 1976. Ahern knew that the dealers were unhappy with the Lincoln-Mercury Division advertising because it featured only some rather than all of the nine available lines. Given this assignment, Suchmann communicated with K&E's writer, Edgar Marvin, and K&E's Art Director, Jack P. Goldsmith. Goldsmith and Marvin suggested animating the live cougar logo which was already a prominent feature of Lincoln-Mercury advertising. Suchmann instructed Goldsmith and Marvin to develop the idea further through storyboards.

In early December, 1975, Suchmann was presented with approximately 50 ideas from his staff. Fourteen of these were eventually selected for presentation to Ahern, two of which featured, as part of the commercial, an animated version of a humanoid feline character. Suchmann testified that K&E's intent was to carry forward the symbol of the cougar and the slogan "The Sign of the Cat", which had been so successful in previous Lincoln-Mercury advertising and which had obtained a high degree of public recognition. After consultation with K&E Account Supervisor John Hickey in December, 1975, it was decided that all fourteen storyboards should be presented to the LMDAs so that they could choose the one they preferred. By this time, requests for new advertising had been made not only by the Boston and New York LMDAs, but also by the Philadelphia, Washington and Buffalo LMDAs.

The fourteen storyboards were presented to each of the five LMDAs in turn, with the Boston group approached first. After reviewing all of the proposed storyboards, the Boston group selected three or four that they preferred, one of which featured the animated cat. A similar presentation was made the next day to the New York LMDA, which also selected four storyboards, three of which (including the one featuring "the animated cat") had previously been selected by the Boston LMDA. Within the next few days, the fourteen storyboards were presented to the Washington, Philadelphia and Buffalo LMDAs, and in each case the LMDAs selected three or four storyboards, including one featuring the animated cat. In view of this response, K&E determined that a commercial featuring the animated cat should be produced. The task of producing such a commercial was turned over to Suchmann who met with Goldsmith and other K&E creative personnel to begin work on the production of the animated cat campaign.

Goldsmith solicited bids from two animation houses, Zander Animation Parlor and Phil Kimmelman and Associates, Inc. Although not the low bidder, Kimmelman was selected over Zander because Kimmelman's office had access to the work of three well-known designers, William Peckman, Roland Wilson and Mordecai Gerstein, an attribute deemed by K&E to be especially desirable.

After the bid had been accepted, Kimmelman's Production Manager, Hal Hoffer met with Goldsmith to receive instructions as to what the animation firm was to produce. Goldsmith showed Hoffer the storyboards embodying the animated cat concept and advised Hoffer that the object was to animate the Lincoln-Mercury live cougar's "strong and masculine" character. The idea appears to have been to animate an established corporate symbol, and in doing so, to create a spokesman which embodied virtues the LMDAs would like the public to associate with Lincoln-Mercury dealers. The character thus had to have human qualities.

During subsequent meetings between Goldsmith and Hoffer, Hoffer was furnished with transparencies and pictures of the live Lincoln-Mercury cougar. Goldsmith also met directly with the designers and advised them that the LMDAs were looking for a unique character, and not a duplication of feline characters used by other advertisers, such as "Tony the Tiger", the figure used in Exxon commercials, the "Pink Panther" or any other animated cat. The designers were instructed to design an animated version of the real "cat on the sign" that would be virile, noble, elegant, classy, macho, sophisticated, sexy and athletic. He was not to be a clown or a buffoon.

With these instructions the three Kimmelman designers, Wilson, Peckman and Gerstein, independently commenced designing an animated feline for the LMDAs. Upon completion, each of the three drawings was reviewed by Hoffer and then presented to Goldsmith, with the recommendation that the character designed by Gerstein was the figure which came closest to fulfilling the design criteria. Goldsmith agreed with this recommendation, rejecting one of the submissions as being "too cartoony" and not manly enough, and rejecting the third as too abstract and not sufficiently masculine. Goldsmith believed that the Gerstein drawing captured the cougar's characteristics in that it represented a proud, masculine animal. Goldsmith conveyed these views to Suchmann who concurred, although he suggested that the animated character be made "brawnier," and this was done.

Although Goldsmith and Suchmann preferred the Gerstein design, each of the three drawings of the animated feline character was presented at a January 21st meeting of the joint LMDA committee. The two versions not preferred by K&E were rejected by the LMDA representatives at the meeting, and the consensus was that the Gerstein design best represented the Lincoln-Mercury cougar. Some modifications were requested, however, because a number of LMDA representatives believed that the proposed figure was too "brutish,"

that is, it was too large in the arms and chest. Other modifications in the initial Gerstein design were also suggested.

Everyone involved in the creation and development of defendants' animated cat expressed the view that they had created a character distinct from any other, including the Pink Panther. Gerstein, who designed the figure used by the defendants, testified that he was not asked to imitate or copy the Pink Panther, and that he did not on his own try to do so. He testified that he was satisfied that the character he created was a take-off of a live cougar intended to represent the dealers. In his view, the figure was proud, intelligent and masculine, but with a little whimsy, and illustrated certain features of the cars. Plaintiffs' expert admitted that Gerstein was an animator who enjoyed an excellent reputation in the industry. We found him to be a forthright and believable witness.

## II. *Plaintiffs' Copyright Claims.*

As the Court's factual findings make clear, K&E, at the request of the LMDAs, set out to animate the Lincoln-Mercury cougar, which was already a part of Lincoln-Mercury's well-known, highly promoted logo of a live cougar reclining on a Lincoln-Mercury sign—"The Sign of the Cat". As one K&E representative testified, the possibilities for utilizing. a live cougar in TV commercials had been just about exhausted. There is no question that defendants have utilized a live cougar in their television commercials for many years, indeed ever since the introduction of their successful line of Cougar model cars, and that the logo has become a widely recognized symbol for Lincoln-Mercury dealers. The defendants clearly had the right to use a cougar character in their advertising and had in fact used a different animated cougar in their television commercials during 1969. Plaintiffs do not and could not contend that they are entitled to copyright protection for the concept of an animated feline character displaying humanoid characteristics. The is-

sue is whether the defendants' animated feline so closely resembles the Pink Panther as to infringe upon the plaintiffs' rights.

■ In an infringement action, a plaintiff must establish ownership of a valid copyright and copying by the defendant. *Novelty Textile Mills v. Joan Fabrics Corp.,* 558 F.2d 1090 (2d Cir. 1977). Defendants contend that plaintiffs never obtained a copyright in the Pink Panther character. Although the Court notes that plaintiff United Artists currently holds copyright registration certificates for both TPP and RPP and that such certificates are generally treated as prima facie evidence of copyright ownership, it is unnecessary for us to reach this question since we find that defendants have not copied plaintiffs' work.

■ The protection granted to a copyrightable work extends only to the particular expression of an idea and never to the idea itself. A plaintiff may prove copying by circumstantial evidence of access to the copyrighted work and substantial similarities between protectable material in that work and the allegedly infringing work. *Reyher v. Children's Television Workshop,* 533 F.2d 87 (2d Cir. 1976). Defendants here concede access, leaving the question of substantial similarity as the primary issue before the Court. Plaintiffs, however, have alleged and have introduced considerable evidence at trial designed to prove intentional or conscious copying by the defendants. We will thus consider that issue before addressing the question of substantial similarity.

■ There is an old saying disparaging collective creative efforts to the effect that "a camel is a horse designed by a committee." This saying is apposite because there is no question that the "animated cat" was the product of the collective thinking of several people at K&E, Kimmelman and the LMDAs, and differs in some respects from the initial concept.[2] As initially proposed, the "animated cat" was even more cougar-

2. For an illuminating portrayal of the number of people involved and the meticulous detail which goes into the production of a 30 second

television commercial, see M. J. Arlen, "Onward and Upward With The Arts—Thirty Seconds," *The New Yorker,* Oct. 15 & 22, 1979.

like than the final version. Doubtless the evolution resulted from the fact that many persons, particularly certain LMDA dealers who served on the committee to approve the advertising, suggested changes in the original design. The suggested design changes included reduction in the musculature of the arms and chest to make the figure less brawny; increase in the tail length to enable some action only a feline could perform (eventually this evolved as a snapping of the tail) and an elongation of the legs to make the figure more nimble. While the original design concept resembled the Pink Panther only in the sense that one animated large feline must inevitably embody some characteristics in common with any other animated large feline, the design changes suggested by the dealers increased the resemblance to the Pink Panther. We find, however, that whatever resemblance exists was not consciously intended.

To support their conscious copying allegation, plaintiffs place considerable reliance upon a memorandum written on January 29, 1976, by K&E Account Supervisor John Hickey, to all LMDA executives informing them that the Boston, New York, Philadelphia, Washington and Buffalo LMDAs had agreed to produce a series of television commercials featuring an animated cat. Hickey wrote:

> "After reviewing a total of fourteen storyboards, they have all agreed on a commercial approach that will forever be referred to as 'animated cat'.
>
> "Attached is a colorstat of the animated cat and I am sure you will agree that there is a very close resemblance to the Pink Panther of movie fame. That was our intention."

Defendants contend that Hickey had nothing to do with the creation of the animated cat, that the memorandum was prepared after the design had been completed, and that the memorandum was merely Hickey's way of explaining what an animated cat campaign would be like.

The Court finds defendants' arguments persuasive. One could not conduct an intelligent conversation among animators or advertisers with respect to an animated duck, without reference to Donald Duck or with respect to an animated mouse, without reference to Mickey Mouse. We do not find it surprising, therefore, that there should be references to the Pink Panther in a description of what an animated cat would be like, or that comparisons to the Pink Panther should be made. In the Court's view, the Pink Panther is undoubtedly the preeminent animated large feline character. In any discussion or consideration of such characters, the Pink Panther provides an important point of reference.

We recognize that two of plaintiffs' expert animators, Zander and Williams, expressed the opinion that there was conscious copying. Williams testified that he believed a moviola, a device to project a film image in a manner which will facilitate its copying, had been used. Such testimony, however, is only conjecture and is contrary to the detailed, precise testimony concerning how the animated cat evolved. We credit, too, the testimony of defendants' witnesses as to their initial desire to create a unique figure which would be an appropriate symbol for the Lincoln-Mercury dealers themselves and which would at the same time continue the identification in the public's mind between a cougar and this particular automobile dealership.

Once one accepts the credibility of that initial concept, one readily accepts as well defendants' contention that it would have been particularly inappropriate to utilize the image of the Pink Panther for this purpose. First, the Pink Panther would not be a unique character identifiable with the defendants and the defendants only. But more important, the image of the Pink Panther is not an image of the strong, masculine figure desired and ultimately created by the defendants. As has been noted, in the first film, TPP, the Pink Panther appeared as a somewhat fey, clumsy, inept loser, a comical figure hardly fit for either the desired personification of the LMDA dealers or a corporate symbol. Even in the second film, RPP, where the Pink Panther is admittedly more sophisticated, his patent-

ly "showbiz" personality renders him unsuitable for the LMDA's purposes. There are thus sound reasons in the conception of the animated cat utilized by the defendants which negate plaintiffs' allegations of conscious copying. We think that the defendants did not approach the plaintiffs for license rights to the Pink Panther because they did not envision what they were doing as being a conscious copying of that figure.

The conclusion that the defendants did not consciously set out to copy the Pink Panther does not end this Court's inquiry. The question which we find far more difficult to resolve is whether the creative people at Kimmelman and K&E, all of whom concededly had access to the Pink Panther, subconsciously, as the character evolved, incorporated the attributes of the Pink Panther in the character which they were creating to such an extent as to render it an infringement, albeit an innocent infringement. To help with a resolution of this question, we have viewed the films in question on a number of occasions and under different circumstances. For example, at plaintiffs' request, we viewed the film in a theatre setting utilizing the originally intended stereoscopic projection technique. We have also observed the defendants' commercials, trying to put ourselves in the position of the typical television viewer, whose concentration on commercials is hardly studied or intense. On the basis of these viewings and all the testimony and documents admitted into evidence, we conclude that the resemblances between the two figures are not of such magnitude as to support the allegation of subconscious copying. In any case, the Court is convinced that the Pink Panther and the animated cat are not so substantially similar that an ordinary viewer of defendants' television commercials would not readily detect the differences between them. See *Novelty Textile Mills v. Joan Fabrics Corp., supra; Arnstein v. Porter,* 154 F.2d 464 (2d Cir. 1946).

In making our comparison, we have not limited ourselves to the physical character-

istics of the two animated characters as they might, for example, be depicted in a still photograph or drawing. Rather, we have considered the two characters as they appear in their totality. For example, neither the Pink Panther nor the defendants' animated cat speak. But in both instances, there is a voice over.[3] We consider the actions taken by the two figures and note defendants' contention that the bits of business engaged in by the Pink Panther in the two films, TPP and RPP, are ordinary and common bits of business that are standard animation tricks. For example, the defendants contend the use of a top hat and a cane and a policeman's hat are standard props in animation. In considering how the characters move, we note that both characters use what the animators describe as a "double bounce," a form of movement which creates the impression of a lively, jaunty stride. We consider, of course, the color of the characters, there being no question but that the single most salient feature of the Pink Panther is that characteristic which gives it its name, that is, its color. The animated cat's color is not pink, but is a color which more closely resembles that of the natural animal. We consider, too, the music which accompanies both the Pink Panther and the animated cat; the music is indeed a very significant aspect of the depiction of these characters. At one stage in the evolution of the defendants' commercial, consideration was given to the playing of a musical piece which had been used in the past, entitled the "The Cat's Got Your Number," and an early storyboard showed the animated figure singing, or made some reference to the animated figure singing. This music, however, was rejected and an original piece was composed for the new commercials by Allan Scott of Scott-Texter Music, Inc. This is a lively piece of music accompanied by a whistle, emphasizing the suave, sophisticated, up-beat nature of the character depicted. While plaintiffs do not contend that there has been an infringement of the music in the Pink Panther, they do contend that the similarities between the musical

---

3. Use of a voice-over technique, defendants' witnesses testified, permitted greater flexibility in the use of the animation with varying commercial messages.

accompaniment in the Pink Panther and the defendants' commercials increase the resemblance and the likelihood of association in the minds of the average viewer/listener.

Of course, we also consider the physical characteristics of the figures themselves. In this regard, the defendants strongly urge that there is a significant difference not only in the personality of the Pink Panther as depicted in the first and second films, but also in its physical appearance. The character in the second film is alleged to be entirely humanoid as opposed to the initial appearance of the Pink Panther which both physically and in its actions was much more feline. In the first film, defendants contend the head shape of the Pink Panther is feline in appearance, whereas in the second film, it is highly exaggerated in design.

The defendants contend that the animated cat, on the other hand, despite its human actions,[4] looks like a live cougar, and is a far more realistic looking animal than the Pink Panther. We agree with this contention. As defendants point out, the outstanding characteristic of the animated cat is its massive upper torso and arms. Indeed, the defendants claim that in terms of physical depiction, the only similarity between the two is that both have chops, elongated muzzles and both are stand-up characters with some humanoid features. Also, both have a stomach which is lighter in color than the rest of the body, elongated slender legs and tails and necks which are down to their shoulders. These characteristics, the defendants contend, and we agree, are common to many cartoon characters and are indeed an embodiment of how a cartoon character, particularly a feline cartoon character, looks.

Having made the foregoing comparisons, and having also attempted to put ourselves in the role of the casual observer, we do not believe that the similarities between the defendants' animated cat and the Pink Panther suggest copying, or even if they did that they are of such magnitude as to constitute an infringement. This is not a case in which an advertiser has for the first time invoked the concept of a feline character as part of its logo or identification. Rather, there is a considerable history of identification between the defendants and the cougar as a symbol and the utilization of the cougar on top of the Lincoln-Mercury dealer sign as a logo. We believe that the casual viewer of defendants' commercials would identify the animated figure appearing in those commercials with the live cougar previously utilized in similar commercials, rather than with any other animated character. In short, we believe that the defendants succeeded in doing what they claim they set out to do, namely, to create a character which was unique, which was identifiable with their previously utilized logo, and which could be regarded as a representative of the dealers themselves.

We recognize that the question is not entirely free from doubt, but we think in large part this results from the fact that, as we have indicated above, the Pink Panther is the preeminent large feline animated character and is therefore a point of reference in comparison of any other such characters. We find that there has been no copying, intentional or otherwise, and applying the test of substantial similarity, *i. e.*, whether an average lay observer would recognize the alleged copy as having been appropriated from a copyrighted work, we find for the defendants.

Having so concluded, it is unnecessary for the Court to consider defendants' challenge to plaintiffs' standing to sue with respect to the copyright in "The Return of the Pink Panther" and other issues which have been reserved for subsequent trial.

### III. *Plaintiffs' Unfair Competition Claims.*

Our factual conclusions with respect to the principal issue lead us also to conclude that plaintiffs have suffered no infringement of any rights arising under state or federal unfair competition laws.

---

4. The animated cat, intended as a symbol for Lincoln-Mercury salespersons, would never, defendants urge, sit on all fours or engage in other *actions* characteristic of a feline but inappropriate for a human.

There has been no attempt to pass off the animated cat as the Pink Panther, there has been no misrepresentation of plaintiffs' good will in the Pink Panther created by a confusion of sponsorship, and defendants have not misappropriated in any fashion any secondary meaning in the Pink Panther. In short, no basis for an action in unfair competition or dilution appears from the evidence developed at the trial.